COMMONWEALTH *vs.* JOHN H. BAKER.

Bristol.    April 1, 1963. — May 13, 1963.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Practice, Criminal,* Appeal, Capital case.   *Homicide.   Wanton or Reckless Conduct.   Firearms.   Error,* Whether error harmful.   *Evidence,* Judicial discretion.

Under G. L. c. 278, § 33E, as amended by St. 1962, c. 453, this court upon an examination of the facts in a capital case may direct the entry of a verdict of a lesser degree of guilt than that indicated by the verdict rendered if it believes that the verdict of the lesser degree is more consonant with justice.   [108–109]

Upon review of a capital case under G. L. c. 278, § 33E, as amended by St. 1962, c. 453, in which the defendant was convicted of murder in the first degree for shooting a man almost a stranger to him, this court decided that, although there was evidence warranting a finding of premeditation on the part of the defendant, a conclusion that his intention to shoot was formed in the heat of sudden affray or combat was supported by the weight of the evidence and that justice would best be served by entry of a verdict of guilty of manslaughter where there was evidence that the decedent, who recently had acquired certain privileges at a beach club operated by the defendant, twice in a short space of time drove rapidly and unsafely into the defendant's property with dogs in his automobile in violation of the club's regulations and parked in an unauthorized place, that the second time the decedent entered the property the defendant became "irritated" at the decedent's ignoring his signal to stop and other conduct, procured a loaded revolver to enforce the regulations, and fired it into the sand on the beach to attract the attention of the decedent and three companions who were then walking down the beach, that the decedent, "furiously angry," came toward the defendant and, after an altercation with him, struck him in the face, knocking off his glasses, and challenged him to shoot, that the defendant fired a warning shot but the decedent "kept on coming" with his companions close behind, and that thereupon the defendant, "terrified," fired a second shot intended to be "at his shoulder" but instead mortally wounded him.   [109–119]

In cross-examination of a witness for the Commonwealth at the trial of an indictment, there was no prejudicial error in exclusion of a question which had in substance been covered by a previous question and answer.   [119–120]

On the record of the trial of an indictment there was no error in the denial of a motion to strike the answer to a question asked a witness for the

Commonwealth by the judge in an effort to clarify confusion in the witness's previous testimony.   [120–121]

At the trial of an indictment for a homicide at which the defendant claimed he acted in self-defence and there were admitted in evidence numerous incidents of turbulence in the life of the decedent, there was no error in refusing to permit a police officer called by the defendant to testify regarding an attempt or threat by the decedent to assault the officer while being arrested in the year preceding the homicide.   [122]

INDICTMENT found and returned on November 8, 1961.

The case was tried in the Superior Court before *Smith,* J.

*Solomon Rosenberg* (*Richard Paull* with him) for the defendant.

*Robert W. MacDonald,* Assistant District Attorney, for the Commonwealth.

WILKINS, C.J.    This is an indictment for murder.    After our decision on a motion for bail, 343 Mass. 162, the defendant was tried and found guilty of murder in the first degree with a recommendation by the jury that the sentence of death be not imposed.    He was sentenced to life imprisonment.    G. L. c. 265, § 2 (as amended through St. 1956, c. 731, § 12).    In response to a motion for particulars the Commonwealth specified that the murder was committed at or near Horseneck Beach, Westport, between 5 P.M. and 7 P.M. on June 10, 1961, by discharging a firearm into the body of Herbert J. Straker, Jr.; and that the murder was committed with deliberately premeditated malice aforethought, but not with extreme atrocity or cruelty or in the commission or attempted commission of a crime punishable with death or imprisonment for life.    At the trial which was made subject to G. L. c. 278, §§ 33A–33G, as amended, the defendant admitted the shooting but claimed that he acted in self-defence.    The case is here on the defendant's appeal, which is accompanied by a summary of the record, a transcript of the evidence and the assignment of errors. The alleged errors relate to rulings on evidence, the denial of a motion for a directed verdict, and the denial of a motion for a new trial.

1.    By St. 1962, c. 453, G. L. c. 278, § 33E, was amended so as to broaden our powers in the review of capital cases.

The amendment struck out the first sentence of the second paragraph of § 33E, and substituted the following: "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree."[1]

As before the amendment, the statute still consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. *Commonwealth* v. *Gricus,* 317 Mass. 403, 406–407. *Commonwealth* v. *Cox,* 327 Mass. 609, 614. *Commonwealth* v. *Harrison,* 342 Mass. 279, 297. The amended statute for the first time creates a duty upon our part to consider the degree of guilt. If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare. This is a power which the trial court does not have.

With these factors in mind, we must weigh the evidence without the benefit of seeing the witnesses. *Commonwealth* v. *Cox, supra,* 615. The surprising feature of the case is

---

[1] Before the amendment a murder case did not remain a "capital case" within § 33E after a verdict of guilty of murder in the first degree with a recommendation that the sentence of death be not imposed. *Commonwealth* v. *Vaughn,* 329 Mass. 333, 339–340.

that a minor controversy could explode into the killing of a human being, particularly where the principals were acquainted only slightly, if at all. The defendant, about fifty years of age and a resident of Westport, was the owner of a private beach where, as a business, he ran a beach club. The decedent, also a resident of Westport, was fifty-five years of age. The defendant's testimony was that he did not really know the decedent and would not have recognized him had they met; that he remembered seeing him only twice before June 10, 1961; that the first time was in 1956 when the defendant drove a man to the decedent's house where the decedent, in what we shall describe as most derogatory terms, ordered the defendant to take the man away, adding, "I'll kill him if you don't take him away"; and that the second time was in 1958 when the decedent was walking on the beach and was pointed out to the defendant.

On May 23, 1961, the decedent's wife became entitled to certain club privileges for her family and guests, for which the decedent paid $35, the lowest of three rates, and for which she received a card marked "1961 open house parking only," and a copy of the club regulations, which stated that the parking card was "good only on Lot #1." Among others, there were rules that cards furnished for identification must be shown when required; that the gate would be open until sunset or until bathers departed, whichever was earlier; and that no pets were allowed.

On Saturday, June 10, 1961, there was much traffic because a sloop was grounded on the beach about 700 feet to the west of the defendant's property.[1] About 4:30 P.M., while the defendant was at home, the decedent drove his wife and two "large" Weimaraner dogs to the beach entrance. His white Cadillac was stopped by one Duffy, a special police officer of the town, first because he believed that the decedent was not a member, and then, when the decedent's wife said that she was, because of the dogs. The decedent said, "You are not going to stop me or no-

---

[1] The witness Lees testified that a chalk gave a fair representation of where the sloop was. The scale on the chalk gave one inch equaling twenty feet.

body else, John. I'm going in, dogs or no dogs.'' Duffy told the decedent that he would inform the defendant, and that the decedent's check would be returned and his membership would cease. The decedent then withdrew.

The decedent drove to a neighboring inn, where he had a drink containing vodka. About five minutes later accompanied by a man, who was a member of the beach club, he drove his car and the dogs back to the beach. At the entrance to the defendant's property, he drove ''at a very high rate of speed,'' forty to forty-five miles an hour, past Duffy, who ''had to jump back to avoid being hit, or for fear of being hit by the car.'' After ten to fifteen minutes at the beach, where the car was parked on lot 3, to the decedent an unauthorized place, they returned to the inn.

At the bar the decedent found three men, Harney, Lees, and Reed, whom he drove to the beach in order to see the sloop. The dogs were still in the car. In the meantime at 5:22 P.M. the defendant had returned and was at the entrance, where Duffy was telling him about the decedent's visits, when the white Cadillac appeared again. The evidence is conflicting as to what then happened. According to Duffy, the car entered at an even faster rate than before, at more than forty-five miles an hour, and did not slow down or stop. According to Harney, the Cadillac had to stop because of two cars in the driveway. According to Reed, they did not stop at the gate, and an arm signal of the defendant was ignored. According to Lees, they came ''almost to a stop.'' The defendant held his hand out with the fingers extending stationary, but the decedent continued by and picked up speed. According to the defendant, the white Cadillac ''came tearing in at a very fast rate of speed,'' past Duffy. The speed was thirty-five miles an hour, and anything over fifteen or twenty miles an hour would be unsafe in that spot. The defendant held up his hand and yelled, ''Stop.'' The car kept increasing speed, and continued on again into the third parking lot. As it was driven past the defendant, the driver hollered out of the window. The decedent's three companions heard, but

testified that they did not know, the words used. According to the defendant, who did not at that time identify the person shouting, the last two words were "you, Baker."

We now reach the circumstances of the shooting, and shall first take up the testimony of the defendant. He got into his car and drove as fast as he could to the same parking lot, because he wanted to find out who it was who had come in at such an unreasonable rate of speed and had ignored the officer at the gate. He parked about 150 feet from the white Cadillac. He then saw the two Weimaraner dogs jumping in the back of the car, and knew that the decedent probably was in the group. "The men were all getting out of the car then and starting down on the beach, and so, of course, I knew that he had been over two times, and I felt that there was a chance that he might be making trouble. He had a reputation for being a troublemaker, and I was afraid that if I didn't protect myself, I would be in danger of being badly harmed or possibly killed by him. So I went to the pump house and got my gun." He had previously blown a whistle. After getting the gun "I started off down the beach to speak to them and ask them to take their car and the dogs off the parking lot. And I hurried as fast as I could. . . . And I overhauled them rapidly until I was probably within 100 feet of them. And then I blew a whistle at them." The men made no response any more than they did to the previous blowing of the whistle. He then blew the whistle a third time, and all turned around. He did not definitely recognize any of them. When the men paid no other attention, "[t]hen I felt that they were deliberately ignoring me and I would have to bring their attention; and so I took the gun out of my pocket and fired it" into the sand to one side. The men turned around again and started back toward the defendant. The one who later turned out to be the deceased was in front. The others were slightly in back of him, one to his left, one to his right, and one almost directly behind. The deceased "appeared to me to be furiously angry. He was hurrying, rushing towards me, really plunging at me.

Commonwealth *v.* Baker.

His face was contorted and red.   He seemed to be in a vio-
lent temper.''   When he was within a step or two of the
defendant, he more or less shouted, ''You can't put me off
the beach.''   At the time the gun was either at the de-
fendant's side or in his pocket.   The other men were in
''sort of a semi-circle.''   ''I was frightened at that time.
I felt sure that they were ganging up on me, and they were
going to jump me.   And with my stomach condition, it
might be — do serious harm, or even kill me.   And, so, I
really was in terror.''   The deceased then struck the de-
fendant in the face ''to the side of the nose.''   The defend-
ant did not know whether it was a left or right hand punch;
''it came so fast; and I was absolutely unprepared.''   ''I
fell back a step or two, and I said to him: 'I can put you off.
Do you want your money back?'   And he went into a box-
ing position.''   The defendant did not actually know it was
Straker, but believed that it was.   The defendant's glasses
were knocked off.   ''I had lost all confidence then because
I'm used to wearing glasses.   You take my glasses off and
I'm completely lost.   I have worn glasses since I was
seven.''   The deceased said, ''If you want to fight, I'll give
it to you.''   ''I said, 'If you come on, I'll shoot.' ''   The
deceased replied, ''You don't dare shoot.''   ''Frankly, I
didn't dare not to.   He was too close; and the others were
too close behind him.   There was no chance to get away
from them that I could see.   And the only thing I could do
was shoot.   I didn't want to shoot to hurt him, but I did
want to warn him off; and, so, I shot. . . .   I might have
aimed at his arm.   I don't remember.''   ''At the time, I
didn't think I did hit him. . . .   I didn't even intend to hit
him.''   The reason for firing the shot ''was really to let
him know that the gun was loaded — that he had heard the
shot, but he might feel that I wouldn't use it, you know; and
I wanted to let him know that I would use it, so that he
wouldn't force me.''   After the shot was fired ''He kept on
coming . . . .   He was even closer.   And I really was ter-
rified at that time that he was going to get the blow in.
And, so, I shot at his shoulder at that time to try to stop

him and the other men who were coming in from both sides and ganging up on [sic], as I saw. . . . He pitched forward on his face, and the other men came to a stop.'' The defendant did not intend to kill or mortally wound him.

Most of the foregoing testimony of the defendant is from his direct examination. On cross-examination, the account of the shooting was not substantially changed. When the defendant followed the four men to the beach, he did not drive up to them, because ''I figured that if I went over there and parked and got out, and walked over to them, it would not look as though I was quite so irritated with them. And I cooled down a little by that time. I didn't feel as upset . . . . [W]hen they come tearing in like that, it is irritating to anybody, and for a minute you are irritated by it. . . . I was irritated enough to go after them and find out why they came in that way.'' ''It is my experience at the beach that if anybody pulls off any infraction like this, you must immediately go and straighten it out with them.'' The rules the defendant intended to enforce were about dogs and coming on to the wrong parking lot. The pistol held eight cartridges, and he kept it loaded in the pump house. After he obtained the gun, he was not in actual fear at that time. ''I figured that with the gun I had the situation in control. . . . Of course, I didn't figure anybody would attack me with a gun.'' When the decedent fell, his head was within three feet of the defendant's feet. The defendant is six feet tall and weighs 185 pounds. The first shot at the decedent was ''more or less aimed at the ground.'' ''Evidently he was closer than I thought he was. I was shooting nearer to him than I realized . . . because it struck him.'' At the second shot ''I was terrified then. He was coming in on me with these three men right surrounding me practically. . . . It was daylight, and he had knocked my glasses off so I couldn't see anything; and at that time I tried to shoot at his shoulder. . . . I hadn't run for some time any way; but if I had tried to run in any direction, the men would have been on me before I could have done anything. If I had turned either way or back

to them, they were right there.'' After the deceased was shot, the defendant was dazed and stood there looking at the other men, who ''stopped dead.''

We now examine testimony by the decedent's three companions, who were witnesses for the prosecution, as to the circumstances of the shooting. First, we notice the testimony of Harney. When the four men reached the beach, the car was parked close to a little building. They walked in single file, with the deceased in the rear, very close to the water's edge, in the direction of the sloop. Harney heard no whistles. It was close to high tide. The day was very windy, cloudy, and foggy. The southwest wind blew at twenty-five to thirty miles an hour. The surf was really pounding. When they had walked approximately 250 yards, half the distance to the sloop, he heard a shot, turned around, and saw the defendant 150 to 200 feet away walking very rapidly up the beach, and the decedent walking back toward him. Harney and Lees resumed walking toward the sloop. A minute or two later Harney turned around again and saw the decedent's left hand in the air. The defendant was twelve to fifteen feet from the decedent. Harney began to walk back. It then appeared that there was trouble because there was hollering. As he walked, the decedent and the defendant were in his sight all the time. When he arrived back where the two were, the decedent stopped almost even with him. The defendant raised his gun and fired. The decedent did not flinch or move but stood momentarily. He then took a few steps toward the defendant, who raised the gun and fired again. The deceased sank to the ground with blood coming out of his mouth. Harney said, ''Oh, my God, look what you have done to this man for nothing.'' He did not see the decedent strike the defendant nor anything happen to the defendant. Harney had walked back seventy-five to eighty feet when the first shot which hit the decedent was fired. After the decedent's hand was in the air the two men faced each other a ''minute or two.''

On cross-examination, Harney's testimony was somewhat more in detail. The decedent's hand ''went through the

air.'' The defendant's glasses "evidently were knocked off.'' After this the two separated farther, but Harney did not know which of them stepped back. Then the decedent took three or four forward steps before a shot was fired. Harney did not hear any conversation, and did not know "what caused this situation.'' After the first shot the decedent "was plunging forward'' toward the defendant. He moved "another 3 or 4 feet.''

We next examine the testimony of Reed. The decedent drove the car as far as he could to the west end of the beach area. The four men started walking in a westerly direction. Reed heard no whistles. When he heard a shot, he stopped and turned. He saw the defendant hurrying down the beach toward them. The decedent started walking back toward the defendant. Reed started walking again toward the sloop. A minute later he thought he heard voices, and turned in time to see the decedent in the process of making a swinging motion at the defendant, and the defendant's glasses fall. The glasses "seemed to hang on one ear for a fraction of a second before they fell. That drew my attention to them.'' The defendant and the decedent parted six to eight feet. Reed then started to walk slowly toward them. Twenty-five or thirty seconds later the decedent moved toward the defendant. Reed heard a shot, but did not see it fired. The decedent kept advancing. There was a second shot, and the decedent stumbled and fell forward on the ground. Not more than one or two seconds elapsed between the two shots. The defendant was standing with a gun in his hand, and appeared dazed.

We next examine the testimony of Lees. The car was parked at the end of the parking lot. As they headed westerly up the beach he did not hear any noises until he heard a "pop.'' They all turned around and saw the defendant walking rapidly up the beach. Lees then turned back and proceeded toward the sloop. When he heard another shot he turned simultaneously with a second shot which he saw the defendant fire. He was 100 to 125 feet away. The decedent and the defendant were six to eight feet apart. Lees heard no conversation.

Certain testimony, mostly by the defendant, respecting his relationship with the sloop must be noticed. The judge in denying the motion of the defendant for a directed verdict on the charge of murder referred to "the fact that he had an interest in the boat towards which they [the four men] were going." The district attorney made this subject the first in his closing argument, and said that the defendant "tried to claim this sloop as his very own." About 8 A.M. the defendant, who was working on the beach with four men, saw a skiff on the beach which they picked up, put on a truck, and put in his garage for safekeeping. When he returned, he saw the sloop washing in the breakers. He stationed a man at the sloop, and took the painter and tied it to a stake they drove into the sand. He later went aboard, and removed the anchor, which he put in the skiff. The defendant intended to take possession, and had a bulldozer come to free the sloop, which was embedded in the sand. His purpose was to put it in a cradle and take it to a boat yard, but the chief of police informed him that he had no claim for salvage and could not have a man looking after the sloop. The defendant withdrew his claim for salvage, but told the chief that he felt that he still had a claim for the work that he had put in on it. He was "disappointed."

The situation was one where a man with recently acquired beach club privileges was bent upon asserting those rights to the utmost. On the other hand, the defendant, who owned part of the beach and was proprietor of the club, was "irritated," to use his own word, at the conduct of the decedent. On the weight of the evidence, the latter must be taken to have driven very rapidly and unsafely into the defendant's property twice in a short space of time, at least once without stopping. He left his car each time in a place not permitted to him. He had been told by the special officer that the presence of dogs in the car was in violation of the regulations. While not intoxicated, he may have been made bold by liquor.

After the defendant reached the beach and saw the four men walking westward toward the sloop, it was an act of

extraordinarily poor judgment to procure a loaded revolver as a means of enforcing the regulations, and it was an unfortunate act to fire it into the sand as a means of attracting attention. With the surf pounding at high tide, the whistle may not have been heard.

The weight of the evidence clearly is that the defendant was struck in the face by the deceased. Two of the latter's companions saw his left hand raised. One of these saw a blow struck, and both saw the defendant's glasses knocked off. The defendant's testimony as to the blow is strongly corroborated by photographs of his face. We do not understand that the prosecution controverts the fact that some sort of a blow was struck. That the defendant had a gun in his pocket or at his side did not make him subject to being struck by the deceased. Having received one blow, he was not obliged to risk further battery at the will of the deceased. The antagonists being strangers, or almost strangers, to each other, we evaluate the evidence as showing no purpose to harm the decedent before the blow was struck, and even then not until the decedent with bravado challenged the defendant to shoot and by advancing demonstrated a purpose to inflict further bodily injury. By this time, the defendant testified, he thought that he was in real physical danger. His conduct indicates that very likely he did. His antagonist was not alone and was sturdily built, being five feet eight and one-half inches tall and weighing 220 pounds.

Apart from the defendant the witnesses to the shooting were, not unnaturally, sympathetic to the decedent, who had brought them to the beach. That they were not disposed to give testimony which might benefit the defendant is clear from the fact that, although they were in the car and heard the decedent holler at the defendant, they did not testify what were the words. Based on the two last words which the defendant said he heard the statement breathed defiance and was of an uncomplimentary character.

The defendant was not helped with the jury by his futile and unfounded claim to salvage rights in the sloop. That he was "disappointed" on this score, we consider of no

importance in our determination of the disposition required by justice.

There was evidence warranting a finding of premeditation. *Commonwealth* v. *Webster,* 5 Cush. 295, 304–306. *Commonwealth* v. *Tucker,* 189 Mass. 457, 486–489. We believe, however, that justice will be more nearly achieved by concluding that the intention to shoot was formed in the heat of sudden affray or combat. *Commonwealth* v. *Webster, supra,* 305. *Commonwealth* v. *Young,* 326 Mass. 597, 601. See *Commonwealth* v. *Crowley,* 165 Mass. 569; Am. Law Inst., Model Penal Code, § 210.3 (Proposed Official Draft, May 4, 1962); Warren, Homicide, §§ 94, 137; Perkins, Criminal Law, 434 et seq.

We are of opinion that a verdict of guilty of manslaughter should be entered and the case be remanded to the Superior Court for the imposition of sentence.

2. (a) The defendant assigns as error the admission in evidence of Harney's statement, "Oh, my God, look what you have done to this man for nothing." The statement was given twice in answer to successive questions. The first question was unobjectionable, "Did you have any conversation with Mr. Baker at this time?" The answer was responsive, and the defendant adopted the proper course to move to have it struck out. The judge ruled, "No, that is res gestae, it all happened at the same time." No exception was taken. In this court the defendant concedes that, except for the last two words, the statement might have been admissible "as a narrative of fact." His argument is that the words "for nothing" made the statement one of opinion. See *Gray* v. *Boston Elev. Ry.* 215 Mass. 143, 146; *Rocco* v. *Boston-Leader, Inc.* 340 Mass. 195, 196; *Commonwealth* v. *Wallace, ante,* 9, 14; Wigmore, Evidence (3d ed.) § 1755; McCormick, Evidence, § 272. We need not decide the question because, apart from the absence of an exception, the motion was to strike the entire statement and not merely those two words. We take this position the more readily in view of our reduction of the degree of guilt.

(b) The defendant further assigns as error that the judge would not permit counsel on cross-examination to

"explore the words 'for nothing.' " Harney immediately previously on cross-examination had testified that he was not close enough to hear any conversation between the defendant and the decedent; and that he did not know "what caused this situation." The exception was to a double question: "You don't know whether Baker provoked Straker, or Straker provoked Baker, do you? You don't know whether or not there might have been some substantially valid reason why Straker attacked Baker, or Baker attacked Straker?" The judge excluded the question as a conclusion or speculation, saying, "He says he didn't hear anything." The question had in substance been covered by the previous question and answer. The defendant, therefore, was not prejudiced in any event.

3. Assignment of error No. 2 is to a question asked by the judge during the cross-examination of one Massey, a police sergeant of Westport, who, as a witness for the prosecution, had testified to a long interrogation of the defendant at the police station on the evening of the shooting. There had just been some confusion in Massey's cross-examination as to the meaning of "the first shot," whether it was the warning shot or "the first shot that hit Straker," and the judge was trying to straighten it out.

The immediately previous cross-examination was: COUNSEL FOR THE DEFENDANT. "Now, do you recall when you were questioning Mr. Baker [at the police station] that he said that he didn't intend to shoot Straker when he shot the first shot, but only wanted to warn him off and keep him away from him — or words to that effect? A. The first shot. Q. The first shot? A. That's right. Q. And do you remember — and by the 'first shot,' I'm talking about the first shot that hit Straker. A. No, sir. Q. What? A. No, sir. Q. You sure of that?" THE JUDGE. "Will you read those last two questions back? It may be a little confusing. (Last four questions and answers were read.)" THE JUDGE. "What does the last answer mean? The first was that Baker told him that he fired the first shot merely to warn him. Now, what does the second answer mean?" THE WITNESS. "The first shot was fired to warn." THE

JUDGE. "Yes." THE WITNESS. "He fired into the sand dunes to warn him to stop; and the first shot that hit him, he intended to hit him." THE JUDGE. "All right." COUNSEL FOR THE DEFENDANT. "May that last answer go out, your Honor please?" THE JUDGE. "No, I will let it stand. Otherwise it would be confusing." COUNSEL FOR THE DEFENDANT. "Well, my exception to that." It will be noted that there was no exception to the question but only to the denial of the motion to strike. See *Commonwealth* v. *Theberge,* 330 Mass. 520, 527; *Commonwealth* v. *Geagan,* 339 Mass. 487, 513; *Commonwealth* v. *Silvia,* 343 Mass. 130, 136.

The defendant's argument on this assignment of error is five lines in length. It is confined to pointing out that nowhere in the interrogation was there any statement that he intended to hit the decedent, and to a citation of *Commonwealth* v. *Jones,* 319 Mass. 228, 230.

The interrogation is susceptible of an inference that the defendant intended to hit the decedent. As read into the record, the interrogation was in part that the decedent hit the defendant and "Then he stepped back and took the position of a boxer and said 'You want to fight?' And then he started forward and coming to me. And according to my remembrance, I said, 'If you keep coming, I am going to shoot.' And he kept coming. So, I shot once. He continued coming. I shot again. He fell down on his face, forward." The two men were about five feet apart. The first shot did not seem to have any effect. "He kept coming, came another step, anyway. I fired the second time. He fell forward on his face."

We are of opinion that there was no error. The first question quoted on cross-examination sought to summarize part of the interrogation by using the phrase, "words to that effect." That summary was not wholly accurate.

The defendant's testimony at the trial shows that he could not have been harmed by the judge's effort to clarify the answers. He testified, "I might have aimed at his arm" the first time he hit the decedent; the next time, "I shot at his shoulder."

The case of *Commonwealth* v. *Jones,* 319 Mass. 228, 230, is not pertinent. It sought a bystander's contemporary opinion as to what the defendant was about to do.

4. Assignment of error No. 3 is to the refusal to permit one Peterson, a police officer of Somerset called by the defendant, to testify regarding an attempt or threat by the decedent, while being arrested in 1960, to assault the officer. The defendant's brief contains only a two line assertion that the specific instance of attempted assault should have been admitted and a reference to Wigmore, Evidence (3d ed.) § 198, which indicates that the number of such instances can be controlled by the discretion of the court. As stated in the brief for the Commonwealth, there were numerous incidents of turbulence in the life of the deceased which were admitted in evidence. See Wigmore, Evidence (3d ed.) § 63; McCormick, Evidence, § 160. The defendant's argument, which is scarcely more than a suggestion, does not lead us to conclude that there was error in the ruling assigned.

5. The fourth assignment of error was to the denial of his motion for a directed verdict. The motion asked for the direction of verdicts of not guilty of (1) murder in the first degree; (2) murder in the second degree; (3) assault and battery with a dangerous weapon; and (4) assault and battery. There was no motion as to the crime of manslaughter, of which we have already indicated the defendant could properly have been found guilty on the evidence. There is nothing left for us to consider on this assignment.

6. The fifth assignment of error was to the denial of the motion for a new trial which was based on the four grounds that the verdict was against the evidence, the weight of the evidence, and the law, and that "Justice has not been, or cannot be, done." There is no new point for our consideration.

7. The case is remanded to the Superior Court for the entry of a verdict of guilty of manslaughter and for the imposition of sentence.

*So ordered.*