COMMONWEALTH *vs.* ANGELA D. JEFFERSON.

Suffolk. May 3, 1993. - October 6, 1993.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Capital case.

At a murder trial the judge's instruction to the jury, given orally and in
writing, on voluntary manslaughter was sufficient; there was no merit to
the defendant's contention that a requested jury instruction, given
orally, should also have been given in writing, where the defendant was
not entitled to the requested instruction at all. [264-265]

Discussion of the court's powers and duties under G. L. c. 278, § 33E, in
reviewing a first degree murder conviction. [265-267]

This court declined, in the circumstances of a murder trial, to exercise its
authority to grant relief under G. L. c. 278, § 33E. [267-268]

INDICTMENT found and returned in the Superior Court Department on July 9, 1990.

The case was tried before *Charles R. Alberti,* J.

*Willie J. Davis* for the defendant.

*Nijole Makaitis,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted of murder in the first degree on a theory of deliberately premeditated malice aforethought. She appeals from the conviction and from the denial of her postverdict motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), for the setting aside of the verdict and entry of a finding of not guilty or, in the alternative, for a new trial or a reduction of the verdict to manslaughter.

The uncontradicted evidence at trial was that, on Saturday, June 30, 1990, the defendant stabbed Anthony L. Deas once in the chest with a knife. The knife penetrated Deas's breastbone and heart, and Deas died as a result. The defend-

ant no longer contends that the evidence was insufficient as a matter of law to warrant the verdict. On appeal she argues that (1) "[s]ince the trial court failed to include an instruction critical to the defendant's case along with the written instructions submitted to the jury, the court should grant a new trial or direct a reduction of the verdict pursuant to G. L. c. 278, § 33E"; and (2) since "under the circumstances, a murder conviction is not justified," and since "[m]anslaughter would clearly be more consonant with justice," the court should reduce the verdict to manslaughter.

General Laws c. 278, § 33E (1992 ed.), provides in relevant part: "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree." We have considered the entire case on the law and the evidence and are satisfied that justice does not require either a new trial or reduction of the verdict. We affirm the judgment.

There was little conflict in the trial testimony. Most of the testimony relevant to the issues on appeal was given by the defendant and was uncontradicted. We summarize that testimony below, indicating any significantly contrary testimony.

The defendant was twenty-one years old at the time of the trial. She was unmarried at that time, and had two children who were born before she met the victim, Deas. She lived with the children and her mother, sister, and cousin. About two months after the defendant met Deas, Deas began living with her and her family. He stayed with her five or six nights a week. On days that Deas did not stay with the defendant,

he stayed at his mother's house. On Wednesday, June 27, 1990, three days before the stabbing, the defendant went to Deas's mother's house thinking that she would find him there. Because Deas was not there, the defendant looked for him in the neighborhood. A boy told her that Deas was "at his girlfriend's house," and took her to the home of Jeannine Jones, where she found Deas. That was when the defendant first learned about Deas's interest in another woman.

In the presence of Jones, the defendant asked Deas, "[W]ho's your girlfriend?" Deas "shrugged his shoulders as if to say he didn't know." He did not say anything. The defendant then left Jones's house and Deas came after her. The defendant asked Deas how he could do that to her and "he said, he's not doing nothing. He said there's nothing to the relationship. It was just a one-night thing." Deas stayed with the defendant that Wednesday night and the next night. The defendant's understanding at that time was that their relationship "was still on."

On Friday morning, June 29, 1990, Deas left the defendant's home saying that he would return that night. On Friday afternoon he called on the telephone and said he would be home later, and the defendant "still thought" their relationship was continuing.

Deas did not return to the defendant's home Friday night, and on Saturday morning, June 30, the defendant telephoned Deas's mother, who told her Deas was not there and that he was at Jones's house. The defendant then went next door to her grandmother's house and telephoned Deas's mother again "to see if he had came." Deas's brother told her that Deas was not there. The defendant then took a knife from her grandmother's kitchen and put it in her pocket. Asked on direct examination, "Why did you do that?," the defendant answered, "I don't know." The defendant further testified that she had in mind "[t]hat he had left me for her after he told me that there wasn't nothing to the relationship," and that she was "hurting because of the simple fact that he had told me nothing else was going on and that he still wanted to be with me." Also, she had in mind fights she had had with

Deas in the past. The defendant was in love with Deas. She had never been in love before. She had had "relationships but nothing [she] could really say was love."

After she took the knife, the defendant got a ride from Jackline Quinnerly to Jones's house. She went there "to confront [Deas], to ask him why did he say that he wasn't going to be involved with this girl no more and he was over there." After the defendant arrived at Jones's house, she rang the doorbell and she saw Deas "when he came downstairs." The defendant said to Deas, "I thought you said that you wasn't going to come back to her house again." The following questions were then asked and answers given:

> *Q:* "And what did he say?"
> *A:* "He said, 'I thought I wasn't.' And then when he was going down the stairs, I said, 'Tony, why are you doing this to me?' I said, 'If you didn't want me, you should have just left me alone. You should have never come back.' And then he said, 'just face it, the relationship is over.'"
> *Q:* "And he said, the relationship is over."
> *A:* "Yeah. He said, 'I don't want you no more.' And I said, 'why?' And he said, 'because I don't.' That's when I reached in my pocket, and that's when I stuck him in the chest."
> *Q:* "Did you intend to stick him in the chest?"
> *A:* "No, I didn't."
> *Q:* "Did you intend to kill him?"
> *A:* "No, I didn't. I didn't intend to kill him. I really didn't intend to hurt him. At that point in time, the way I felt — I don't know."

The only testimony of other witnesses that would seem to be significant to the issues on appeal was Jones's testimony that, just before the defendant stabbed Deas, Jones heard the defendant say to him, "[If] you want to live with that bitch, you die with the bitch." Also, Jones's brother, Arthur Jones, testified that he came out of the house when he heard the

commotion and that he heard the defendant says words simi-
lar to those testified to by Jones as the defendant got into
Quinnerly's automobile. Quinnerly gave similar testimony.
The defendant denied having made such statements.

Before orally instructing the jury, the judge gave them in-
structions in writing. Near the beginning of the oral instruc-
tions, the judge told the jury, "Now, what you have in front
of you are handouts. I will read from them. They are pattern
charges, so-called, put together by the attorneys and myself
for your purposes during this trial. . . . Now, I am going to
read them; and you are not going to miss a thing if you don't
look on while I read. I am not suggesting you do look on. I
am only suggesting that if you want to you can. . . . Your
job is to listen and to the best of your ability absorb what I
am saying. If you don't remember it, you've got it. It is going
to be going in with you to the jury room, the same thing I
have said. So, if you say, what did he say about a particular
anything, you have it right there. If you want to use it to
refresh your recollection, do so. If not, don't. The attorneys
agree with me that it is helpful for you to have it for
whatever use you want to make of it."

The defendant does not challenge the completeness or cor-
rectness of the instructions that were ultimately given in this
case. Those instructions dealt with manslaughter among
other subjects. As to manslaughter, the judge said, "Man-
slaughter is the unlawful killing of one person by another
without malice aforethought. . . . The theory of the Com-
monwealth is voluntary manslaughter. . . . Voluntary man-
slaughter is an unlawful, intentional killing resulting from a
sudden transport of the passions of fear, anger, fright, ner-
vous excitement or heat of blood when there is no time to
deliberate and when such passion or heat of blood is pro-
duced by adequate or reasonable provocation and without
malice or upon sudden combat that would have been likely to
produce in an ordinary person an abnormal state of mind and
actually did produce such a state of mind in the defendant.

"The law provides for the crime of manslaughter in recog-
nition of the frailty of human nature. . . . In order to prove

the defendant guilty of voluntary manslaughter, the Commonwealth must prove three elements beyond a reasonable doubt, first, that the defendant inflicted an injury upon Anthony Deas from which he died; second, that the defendant injured Anthony Deas . . . in the heat of passion . . . third, that the homicide . . . was committed unlawfully without legal excuse or justification. The provocation sufficient to reduce an unlawful killing from murder to manslaughter is that provocation which would likely produce in an ordinary person such a state of passion . . . as would eclipse a person's capacity for reflection or restraint and that what happened actually did produce such a state of mind in the defendant.

"The law is clear that mere insulting words and threatening gestures, alone, with nothing else do not constitute adequate provocation to reduce a killing from murder to manslaughter. However, the existence of provocation is not foreclosed absolutely because the defendant learns of a fact from oral statements rather than from personal observation."

When the jury instructions had been completed, defense counsel told the judge that he had just realized that an instruction he had requested relative to manslaughter had been omitted from the written instructions given to the jury. Counsel stated that the requested instruction also had been omitted from the oral charge, and he requested that it be given. Counsel did not request at that time that the supplemental instruction be given in writing as well as orally. The judge then further instructed the jury, orally but not in writing, as requested. He told the jury the following:

> "Ordinarily, mere words are not sufficient to provide adequate provocation to reduce a homicide from murder in the second degree to manslaughter. However, in the case of lovers, what one learns as a fact from the oral statement could constitute a peculiarly immediate and intense offense to lovers' sensitivities, thereby triggering provocation sufficient to warrant a finding of voluntary manslaughter if a blow struck resulted in the death of

the other lover. It must be of such provocation as would arouse a reasonable person. The question to be answered then is would the ordinarily reasonable person placed in the same position in which the defendant found himself and knowing what the defendant then knew or believed he knew have been thrown into such a heat of passion?''

The defendant contends on appeal that, because the supplemental instruction was not included in the written instructions given to the jury, such an instruction having been requested before the written instructions were handed out, a new trial or a reduction in the verdict would be more consonant with justice than allowing the verdict of murder in the first degree to stand. In support of her contention, the defendant relies heavily on *Commonwealth* v. *Schnopps*, 383 Mass. 178 (1981), *S.C.*, 390 Mass. 722 (1984). In that case, we held that a defendant charged with the murder of his estranged wife, whom he had shot immediately after a face-to-face confrontation in which she admitted to adultery, was entitled to a jury instruction on voluntary manslaughter because there was evidence from which the jury could have found that the shooting was done in the heat of passion. Nothing in our opinion in *Schnopps*, however, suggests that a defendant who kills his or her spouse or lover is entitled to a manslaughter instruction especially tailored to the relationship between spouses or lovers. We are unwilling to declare such an entitlement now. The instruction on voluntary manslaughter originally given in this case was sufficient since it (1) indicated that "[a] verdict of voluntary manslaughter requires the trier of fact to conclude that there is a causal connection between the provocation, the heat of passion, and the killing"; and (2) accurately explained to the jury what would constitute "evidence of provocation deemed adequate in law." *Id.* at 180-181. Since the defendant was not entitled to the requested instruction, no injustice was done in this case by the judge giving the requested instruction orally and not in writing. In addition, it seems to us that there is no reason

to believe that the jury gave less credence or attention to the supplemental instruction than they would have if the supplemental instruction had been included in the written handouts. It is just as likely that the importance of the supplemental instruction was emphasized by its separateness and by its having been the last instruction given.

We turn now to the defendant's assertion that "[a] reduction of the verdict would be appropriate because, on the facts of the case, a lesser verdict would be more consonant with justice" than the verdict the jury rendered. The defendant argues, "[t]he bottom line seems to be that Deas played with the feelings and emotions of a young girl who was in love with him. This does not justify the killing. On the other hand, under the circumstances, a murder conviction is not justified. Manslaughter would clearly be more consonant with justice. See *Commonwealth* v. *Baker*, 346 Mass. 107 (1963)."

General Laws c. 278, § 33E, which we quoted in relevant part above, "opens the facts as well as the law for our consideration." *Commonwealth* v. *Gricus*, 317 Mass. 403, 406 (1944). The court in *Gricus*, construing and applying G. L. c. 278, §33E, as amended by St. 1939, c. 341, observed that the statute "does not, however, convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses. . . . But the Statute . . . does give us the power and the duty exercised by a trial judge upon a motion for a new trial. So far as the weight of the evidence is concerned, it is the right and duty of a trial judge to set aside a verdict 'when in his judgment it is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.' *Scannell* v. *Boston Elevated Railway*, 208 Mass. 513, 514 [1911]. *Bartley* v. *Phillips*, [317 Mass.] 35, 41 [1944]. 'The governing rules of law as to motions for a new trial in capital cases are the same as in civil and other crimi-

nal cases.' *Commonwealth* v. *Devereaux*, 257 Mass. 391, 395 [1926]. For a trial judge, or for this court under the statute . . . to grant a new trial on the ground that the verdict was against the weight of the evidence, it must appear that the verdict, if allowed to stand, would work a miscarriage of justice. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 22, 23 [1923]. *Bartley* v. *Phillips*, [*supra* at] 41. It is not enough that the judge or judges, if on the jury, would have felt a reasonable doubt which the jury did not share." *Commonwealth* v. *Gricus*, *supra* at 406-407.

General Laws c. 278, § 33E, was again amended by St. 1962, c. 453, so as to empower this court not only to order a new trial for the reasons enumerated in the statute, but also, in the same circumstances, to "direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." "As before the amendment, the statute still consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. *Commonwealth* v. *Gricus*, [*supra* at] 406-407. *Commonwealth* v. *Cox*, 327 Mass. 609, 614 [1951]. *Commonwealth* v. *Harrison*, 342 Mass. 279, 297 [1962]. The amended statute for the first time creates a duty on our part to consider the degree of guilt. If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is our power and duty so to declare." *Commonwealth* v. *Baker*, *supra* at 109. In *Baker*, the court recognized that, in that case, "[t]here was evidence warranting a finding of premeditation." *Id.* at 119. However, after weighing all of the evidence "without the benefit of seeing the witnesses," *id.* at 109, the court concluded that a manslaughter verdict would be more consonant with justice than a conviction of murder in the first degree where the defend-

ant, believing he was in real physical danger, shot the deceased as he advanced toward the defendant after having struck him in the face. *Id.* at 118. The court, therefore, ordered the entry of a lesser verdict. *Id.* at 119.

In reviewing the whole case broadly, with a view to obtaining "uniformity of treatment of convicted defendants," *Commonwealth* v. *Gaulden*, 383 Mass. 543, 554 (1981), as is our duty under G. L. c. 278, § 33E, we must consider the "thrust" of the evidence, *Commonwealth* v. *Williams*, 364 Mass. 145, 152 (1973), and we must be alert to other clues that justice has not been achieved. For example, in *Commonwealth* v. *Bearse*, 358 Mass. 481, 487 (1970), the court was influenced by the fact that certain proof was promised in the prosecutor's opening, but never materialized. In determining whether a verdict of murder in the first degree was probably due to juror bias or misapprehension, and therefore not consonant with justice, this court may consider the defendant's criminal record or lack thereof, and other evidence of character to which the jury may or may not have had access, which might indicate that a killing had not been deliberately premeditated, contrary to the jury's finding, or instead was a spontaneous, impulsive response to sudden combat or provocation sufficient to cause the killing to be manslaughter. See *Commonwealth* v. *McDermott*, 393 Mass. 451, 460-461 (1984); *Commonwealth* v. *Tavares*, 385 Mass. 140, 159, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Seit*, 373 Mass. 83, 95 (1977); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 703 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 750 (1975).

In the present case, the thrust of the evidence, much of which was the defendant's testimony, was that three days before the defendant stabbed Deas, her lover, in the chest, killing him, the defendant had discovered his unfaithfulness and then had received his assurance that he wanted to continue their relationship. However, on Saturday, June 30, following Deas's failure to return to the defendant's home on Friday night, the youthful defendant, who had never been in love with anyone but Deas, discovered that he had continued

to be unfaithful to her despite his contrary assurances. Feeling hurt, the defendant armed herself with a knife, and sought out and confronted Deas. When told by him that their relationship was over, she stabbed him. Surely, the jury were not required to credit the defendant's testimony that she did not intend to hurt Deas and their contary finding was not against the weight of the evidence. Nothing in the evidence, or in the circumstances or conduct of the trial, or from any other source, including the fact that the defendant had no criminal record, demonstrates that the jury's verdict of murder in the first degree was based on bias or on misapprehension or lack of relevant information. The defendant has not persuaded us, as is her burden, that justice requires a verdict of less than murder in the first degree. Therefore, we decline to exercise our extraordinary authority to grant relief under G. L. c. 278, § 33E.

*Judgment affirmed.*
*Denial of postverdict motion*
*affirmed.*