COMMONWEALTH *vs.* ROBERT WOJCIK
(and a companion case[1]).

No. 96-P-138.

Hampden. November 12, 1996. - October 8, 1997.

Present: BROWN, LAURENCE, & FLANNERY, JJ.

*Homicide. Malice. Felony-Murder Rule. Joint Enterprise. Evidence,* Prior
misconduct, Cross-examination, Telephone conversation, Communication
with social worker, Privileged communication. *Privileged Communication.
Practice, Criminal,* Argument by prosecutor, New trial.

At the trial of indictments for murder, in which the defendants were convicted
of second degree murder, the evidence was sufficient to submit the case to
the jury on alternate theories: second degree murder on the basis of malice
aforethought, felony-murder, or both; and the judge properly left to the
jury the determination whether, in the circumstances known to the
defendants, a reasonably prudent person would have recognized that the
defendants' contemplated action created a plain and strong likelihood of
death, as opposed to a risk of substantial harm. [597-598, 600]

At the trial of two defendants on indictments for murder, the evidence war-
ranted the conviction of one defendant of murder in the second degree on
the basis of malice aforethought and warranted the conviction of the
second defendant of felony-murder on the basis of a joint venture with the
other defendant: there was no inconsistency in the verdicts affording a
ground for setting aside the second defendant's conviction. [600-603]

At the trial of two defendants for murder, evidence of one defendant's prior
bad acts was properly admissible to show a plan, a common scheme, or a
course of conduct. [603-605]

At a murder trial, the judge did not improperly limit the defendants' cross-
examination of a prosecution witness on the issue of bias. [605-606]

At a murder trial, sufficient confirming circumstances tended to authenticate
the admission in evidence of a telephone conversation between a caller and
the testifying witness, and the jury could properly infer that the caller was
the defendant. [606-607]

At a murder trial, the judge correctly ruled that the defendant's statements to a
social worker were not privileged under G. L. c. 113, §§ 135A & 135B,
where the statements were not made for the purpose of diagnosing or treat-
ing the defendant's emotional or mental condition, but were false state-
ments and part of the defendant's scheme to defraud an insurance company.
[607-609]

[1]Commonwealth *vs.* Stephen Wojcik.

At a murder trial, the prosecutor's remarks in closing argument were not improper and did not create a substantial risk of a miscarriage of justice. [609-611]

The judge at a murder trial did not abuse his discretion in denying the defendants' motions for a new trial pursuant to Mass.R.Crim.P. 25 (b)(2), seeking a reduction of the verdict from murder in the second degree to manslaughter, where the issue of the grade of offense had properly been submitted to the jury with appropriate instructions. [611-612]


INDICTMENTS found and returned in the Superior Court Department on November 19, 1993.

The cases were tried before *William H. Welch*, J., and motions for a new trial were heard by him.

*David P. Hoose* for Robert Wojcik.

*Charles K. Stephenson* for Stephen Wojcik.

*Brett J. Vottero*, Assistant District Attorney, for the Commonwealth.

FLANNERY, J. Upon indictments for first degree murder, a Superior Court jury found the defendants, Robert Wojcik (Robert) and his uncle Stephen D. Wojcik (Stephen), guilty of murder in the second degree. G. L. c. 265, § 1.[2] The Commonwealth's evidence tended to show that on June 3, 1993, the defendants, who were passengers in a rental truck being driven by one Marc-Anthony Usher, engineered a motor vehicle collision in Springfield for purposes of insurance fraud, causing the death of Paul Langevin. Usher was the principal witness for the Commonwealth at trial. Both defendants appeal on several common grounds,[3] and Stephen adds one peculiar to himself. They contend: (1) that evidence of Robert's prior bad acts was erroneously admitted; (2) that there was improper limitation of cross-examination of a prosecution witness for bias; (3) that the contents of two telephone calls were admitted in evidence despite insufficient authentication; (4) that a post-incident conversation between Robert and a licensed social worker was privileged and that its admission in evidence was error; (5) that evidence of malice was lacking; (6) that there was impropriety in the Commonwealth's closing argument; and (7) that their

---

[2]At the close of the Commonwealth's evidence, the judge allowed so much of the defendants' motions for required findings of not guilty as charged them with first degree murder.

[3]Stephen's brief recites that he "adopts those claims of error" that are raised in Robert's brief.

posttrial motions pursuant to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), should have been allowed. In addition, Stephen asserts that the errors necessitating a new trial for Robert require reversal of his conviction because the Commonwealth's only theory at trial was that he was Robert's joint venturer. We affirm the convictions, addressing first the principal contentions going to the validity of the second degree murder verdicts against both defendants.

1. *Robert's conviction of murder with malice.* Under the instructions delivered to them by the trial judge, the jury were permitted to convict each defendant of alternative theories, second degree murder on the basis of malice aforethought, second degree felony-murder (as to which the predicate felony was larceny over $250 or attempted larceny), or both. The jury were also instructed that they could return a verdict of involuntary manslaughter, and they were instructed on joint venture. The jury found Robert guilty of second degree murder with malice and Stephen guilty of felony-murder.

The jury were instructed that they could return a second degree murder verdict based upon malice if they found that, "in the circumstances known to the defendant,[4] a reasonably prudent person would have known that according to common sense there was a plain and strong likelihood that death would follow the contemplated act."[5] This is the so-called "third prong of

---

[4] See and compare *Commonwealth* v. *Delaney*, 418 Mass. 658, 667 (1994).

[5] We note that in close juxtaposition to the quoted instruction, the judge stated: "As I said before under the third type of malice, which I indicated to you required general intent, under the circumstances as known to the defendant at the time, would a reasonably prudent person have known of the plain and strong likelihood that death or *grievous bodily harm* would follow the contemplated act? If so, then malice may be found without any actual intent to kill or to do grievous bodily harm and without any foresight by the defendant of these consequences." (Emphasis supplied.) The Supreme Judicial Court has reiterated on several recent occasions that the third prong of malice definition can only be satisfied by proof that "there was a plain and strong likelihood of death," as opposed to death *or* grievous bodily harm. *Commonwealth* v. *Sires*, 413 Mass. at 303 n.14. *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995). See *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996). Robert's trial counsel called the judge's attention to the erroneous reference to grievous bodily harm at the conclusion of the jury instructions, and the judge promptly rectified the problem with a supplementary instruction, which was unchallenged. The judge apparently had familiarized himself with the relevant case law before giving the supplementary instruction. See *Commonwealth* v. *Jeffer-*

malice." See *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992).[6] We conclude that the evidence against Robert on this theory was sufficient to take the case to the jury.

Robert concedes that a reasonably prudent person would have recognized that a serious injury could result from the collision and that such a person would understand that a death *could* have resulted. Robert submits, however, that a reasonably prudent person would not have recognized that the deliberate striking of another vehicle, in which the impact caused only minor damage to both vehicles, would create a "plain and strong" likelihood of death. Robert maintains that the conduct at issue here was much more consistent with the standard required for a conviction of involuntary manslaughter, to wit: a "high degree of likelihood that substantial harm will result to another." See *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990). Robert's motions for required findings of not guilty (Stephen filed such motions as well), filed at the close of the Commonwealth's evidence and renewed at the close of all the evidence, were denied.

As noted, the principal witness for the Commonwealth at trial was Marc-Anthony Usher, who was the operator of the vehicle in which the defendants were passengers.[7] To provide context for the discussion, we briefly summarize the events of June 2, the day before the collision. Usher testified that on that day Robert, who was an acquaintance of his, telephoned him and suggested that he (Usher) had an opportunity to make some money moving some trash. Robert told Usher that he needed someone to rent a truck as he did not have a driver's license and indicated that he would pay for the truck. In Stephen's vehicle, the three drove to a U-Haul rental agency in Chicopee. Robert selected the vehicle (a "big U-Haul truck"), and when Usher remarked that because of its size a special operator's license was required, Robert replied that that was not necessary.

_____

*son*, 416 Mass. 258, 265 (1993) ("It is . . . likely that the importance of the supplemental instruction was emphasized by its separateness and by its having been the last instruction given").

[6]To provide context for his instruction on the third prong of malice, the judge explained the first two prongs of malice but then made clear to the jury that the first two prongs did not apply in the circumstances of the case.

[7]Shortly after the incident, Usher was charged with motor vehicle homicide. On November 4, 1993, the day a show cause hearing was scheduled on the complaint, the charge was dropped against Usher, and he gave a lengthy statement to the district attorney implicating the defendants.

Robert suggested that they purchase additional insurance, which he paid for. The vehicle was insured for $20,000.

With Usher driving, the men left the rental agency. Usher testified that he had never driven a truck that size (he stated that the truck was about eighteen feet long on the inside). Initially, Usher had some difficulty driving the vehicle, having a problem with the clutch. Near West Springfield, Robert remarked that they could make more money if Usher "banged into something." Usher testified that when they approached an intersection near Riverdale Road, Robert said, "You can just hit a car as it's moving," and that there would be "good money involved." When a vehicle containing children approached, the defendants chanted "Go ahead. Do it. Go ahead. It's a good car." Describing himself as "very nervous," Usher watched the vehicle pass by, and told the defendants, "That was messed up, there w[ere] children in the car." The defendants told Usher not to worry about it, they would do it later. That evening, Robert took the truck to his home.

The next morning, June 3, the defendants appeared at Usher's house, and it was agreed that they would remove some debris from a location at Allen and Groveton Streets. Usher drove to the location, with Robert seated next to him and Stephen on the outside. When the men saw that there was no debris on the lot to remove, Usher got back into the truck, backed it up, and proceeded toward Allen Street. As Usher was approaching a stop sign on Groveton, Robert said that "this would be a good place to hit a car." According to Usher, Stephen agreed. The defendants were chanting, "Go ahead. Do it. It's a good place." Usher stated that he was not considering this course of action, and because he was very nervous, he got out of the truck, ostensibly to inspect the front of the property for debris. When Usher returned, approximately a minute later, he told the defendants that the truck would be returned. There was no response from the defendants. Usher proceeded to "inch out" into the intersection, and he saw a vehicle coming from his left. When he was three or four feet into the intersection, Robert put his left foot onto Usher's right foot and depressed the accelerator. Usher "lost control" of the truck, and, although he tried to brake it, the truck "skinned" the oncoming vehicle, a Chevrolet Cavalier, which then veered off to the left and struck a utility pole. Before Langevin's vehicle hit the utility pole, one of the defendants exclaimed, "Yah, baby. We got one." Usher

proceeded to the Langevin vehicle and saw that Langevin was completely underneath the steering wheel. Usher, who was unnerved, began vomiting. Robert then told him, "Don't worry about it. We're going to get paid."

We conclude that the question of whether the defendants could have anticipated that there was a plain and strong likelihood of death, as opposed to a risk of substantial harm to the occupant of any vehicle struck by the U-Haul truck (the standard for manslaughter), was properly left to the jury. On the facts that could have been found by them, the jury could have inferred malice from the action of Robert in deliberately causing a large truck to collide with a much smaller vehicle. Robert was aware of Usher's limited experience in driving a truck of that size. We think this result is a logical extension of the principles found in cases in which the operator of the vehicle struck a pedestrian. See *Commonwealth* v. *Cherubin*, 35 Mass. App. Ct. 919, 920 (1993) (jury could properly find malice in circumstances where the defendants deliberately aimed his vehicle at the victim and one of her friends, who were pedestrians, striking both of them, and then ran over the victim's body); *Commonwealth* v. *Russell*, 38 Mass. App. Ct. 199, 201-202 (1995). In circumstances where a reasonably prudent person would have known of the plain and strong likelihood that death would follow a contemplated act, "malice may be found without any actual intent to kill or to do grievous bodily harm [see note 5, *supra*] and without any foresight by the defendant of such consequences." *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987).

2. *Stephen's conviction of felony-murder.* The jury found Stephen guilty of felony-murder. In a case such as this one, where the underlying felony (larceny or attempted larceny), is not inherently dangerous to human life, the defendant must be shown to have had a "conscious disregard of the risk to human life." *Commonwealth* v. *Matchett*, 386 Mass. 492, 508 (1982). See *Commonwealth* v. *Chase*, 42 Mass. App. Ct. 749, 751-753 (1997). Stephen does not argue that the evidence was insufficient to convict on felony-murder. His challenge is limited to the significance to him of the jury's verdict against Robert, viz., that the verdicts against him and against Robert were in "irreconcilable conflict" on the ground that as Robert was "acquitted" of second degree murder based on a joint venture theory, he (Stephen) could not be guilty of felony-murder as a joint venturer. While stating that he didn't know "quite what to make

of th[e verdicts]," Stephen's trial counsel did not argue to the trial judge that the verdicts were inconsistent. See *Commonwealth* v. *Kelley*, 4 Mass. App. Ct. 867 (1976). In a postverdict motion for a new trial pursuant to Mass.R.Crim.P. 25(b)(2), Stephen presented in skeletal form the argument he now makes on appeal. The motion recites that, "[a]lthough the defendants were charged as joint venturers the jury found Robert Wojcik guilty of actual malice but did not find felony-murder thereby apparently not finding a joint venture." The Commonwealth does not argue here that the defendant has not preserved the issue for the purposes of appeal.

On appeal, Stephen fleshes out his claim, maintaining that, because Robert was acquitted of having murdered the victim during the attempted commission of a felony, there was no basis on which the jury could convict Stephen as a joint venturer to felony-murder. Initially, we might take issue with Stephen's characterization of the verdict against Robert. Robert was not necessarily "acquitted" of felony-murder. The jury were instructed, and properly so, see *Commonwealth* v. *Smiledge*, 419 Mass. 156, 161 (1994), that, "if you're convinced that all the necessary elements of any of these two second degree murders have been satisfied, they've been proved to you beyond a reasonable doubt, it would be your duty to find the defendant guilty of the most serious offense that you find has been proved to you beyond a reasonable doubt." While it is true that the jury were also instructed that they might convict the defendants under both theories, it is entirely possible that they were in fact guided by the above-quoted instructions. In this context, the jury's verdict did not necessarily reflect the exoneration of Robert on a felony-murder theory.

As to Stephen, although it is true that during his instructions on joint venture, the judge stated that "those are the principles of law that would apply relative to the joint venture *which I believe the Commonwealth relies on primarily* as to Stephen Wojcik," we cannot know for certain whether Stephen was convicted on a joint venture theory because the verdict was a general one in this respect: the verdict slips apparently did not afford the jury an opportunity to record whether they were finding the existence of a joint venture. Nevertheless, in order to resolve the defendant's claim, we will assume for the purpose of argument that the jury concluded that Stephen was a joint venturer to felony-murder.

As was observed in *Commonwealth* v. *Coleman*, 30 Mass. App. Ct. 229, 235 (1991), "[w]e construe [the defendant's] argument as grounded, by analogy, on the principle that 'one cannot commit a conspiracy alone,' " quoting from *Commonwealth* v. *Cerveny*, 387 Mass. 280, 285 (1982). On the surface, this is an argument imbued with "seeming logic." 30 Mass. App. Ct. at 234. We start, however, with the general proposition that, apart from the situation in which there are inconsistent verdicts that are impossible as a matter of law, see, e.g., *Commonwealth* v. *Sherry*, 386 Mass. 682, 698 (1982), "[i]consistency of verdicts in criminal cases is not a matter for judicial inquiry." *Commonwealth* v. *Therrien*, 383 Mass. 529, 537 (1981). See also *Commonwealth* v. *Harrison*, 25 Mass. App. Ct. 267, 270 (1988) ("The cases of both our appellate courts have uniformly held that factual inconsistencies in verdicts rendered in the same case do not afford a ground for setting aside a conviction"). Inconsistencies in jury verdicts will not undermine convictions so long as the verdicts are supported by sufficient evidence. *Commonwealth* v. *Coleman, supra.* We are not faced here with a circumstance in which a defendant was convicted of a crime based on joint enterprise and other defendants were *acquitted* of similar charges in the same trial. *Ibid.* See *Commonwealth* v. *Cerveny*, 387 Mass. at 285 (conspiracy trial); *Commonwealth* v. *Hamilton*, 411 Mass. 313, 323-324 (1991). Here, we find no inconsistency in the verdicts, as they are "capable of logical reconciliation." See and compare *Commonwealth* v. *White*, 363 Mass. 682, 684 (1973) (involving same defendant). We have determined that the evidence warranted Robert's conviction of murder with malice in the second degree. The jury could well have concluded that Robert was the initiator as well as the motivating and active force behind the planned insurance fraud, and that a reasonably prudent person standing in his footsteps would be aware that there was a plain and strong likelihood of death resulting from the deliberate collision. A basis for distinguishing the culpability of the two defendants could be found in the conduct of Robert in pressing his foot onto the foot of Usher, causing the U-Haul truck to accelerate and to lose control.

Stephen, on the other hand, could have been found to be a joint venturer because he emboldened Robert and sought to

make the venture succeed. This was established by the fact of his presence at the time the truck was rented, his agreement when Robert suggested that more money could be made by staging a collision than from removing debris, and by the fact that he chimed in by urging Usher to "do it, do it." In his case, as the common law requires malice aforethought for every type of murder, "in felony-murder the intent to commit the underlying felony *is* the required malice aforethought," (emphasis original). *Commonwealth* v. *Moran*, 387 Mass. 644, 649 (1982). There was evidence that Stephen had been involved in insurance fraud in the past, but, whether or not he was in at the planning for the instant collision, "it has been held enough that at the climactic moments the parties consciously acted together in carrying out the criminal endeavor, each thereby becoming responsible for the acts of the others. An element of mutual assent at those moments no doubt there is, but there need not have been an anticipatory compact." *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1987). There was a basis for reconciling the two verdicts because they depended, in part, on different evidence. See and compare *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 369-370 (1977). The present case is to be distinguished from cases such as *Commonwealth* v. *Mandile*, 403 Mass. 93, 98-101 (1988), which Stephen relies upon. In that case the court looked behind the jury verdicts but did so because it could not be known from the jury's general verdict whether it was based upon a theory of deliberate premeditation with malice or felony-murder, and there was insufficient evidence to support the underlying felony in the context of felony-murder. In the present case, as there was sufficient evidence to support the verdict, Stephen's conviction as a joint venturer to second degree felony-murder is to stand.

   3. *Admission of evidence of prior misconduct.* Five witnesses testified to approaches by Robert or statements by him concerning fraudulent insurance schemes similar to the scheme alleged to have resulted in Langevin's death. On appeal, the defendants complain only that the judge improperly admitted some of the evidence that came in through two of those witnesses, Scott Comstock and Joseph Pappaceno, both of whom were neighbors of Robert. According to the defendants, Comstock and Pappaceno's testimony did not bear "the necessary temporal and

schematic nexus to the events at trial to render them relevant" and admissible.[8]

During Comstock's testimony, at a point when Comstock was about to describe a conversation with Robert in May, 1993 (a month before the incident), Robert's counsel requested a bench conference, asserting that Comstock would be testifying as to "a different plan and different scheme" than the one at issue in Robert's trial. After listening to the prosecutor's offer of proof, the judge ruled that the evidence would be "admissible in so far as it shows a common scheme, . . . a plan of action, and it's related close enough in time. It's a peculiar type of arrangement, so it's not the usual thing that you'd get involved [in] with somebody. I think it has relevance."[9] Scott Comstock then testified that in May, 1993, Robert asked him if he was interested in driving a U-Haul truck. Comstock stated that the plan was "to stage an accident and collect some insurance money," and that Robert indicated that he needed the witness to drive as he didn't have a driver's license. If the parties had injuries, they would be claimed, and if not, they would be made up. Shortly thereafter, the prosecutor was on the verge of asking Comstock about another plan Robert had concocted, this occurring about six months previous to that. Another objection produced an additional offer of proof from the prosecutor. The judge ruled that the contents of the conversation would be admissible, and he correctly instructed the jury that prior bad acts could not be used as evidence that the defendant committed the instant offense but only to show motive or state of mind, and whether there was any scheme or continuing scheme in progress. Comstock then testified that Robert's plan was to park outside of a bar, wait for someone who was drunk to emerge, pull in front of the other operator, and then stop suddenly, causing the other driver to hit them; the fact of the inebriated condition of the other driver would support the filing of a false insurance claim.

Joseph Pappaceno was permitted to testify that "a day or two" prior to the June 3 collision, Robert asked him to come to his apartment. Robert told Pappaceno that he and his uncle (the reference, according to Pappaceno, was to Stephen) had a "plan

[8]Robert had filed a motion in limine to exclude, in pertinent part, evidence of prior attempts by him to induce insurance fraud.

[9]The judge also ruled, and instructed the jury, that the statements would only be admissible as to Robert.

to be driving Corvettes by the end of the summer." Robert asked Pappaceno if he would be willing to drive a U-Haul, and indicated that he would have someone with a stolen vehicle hit the U-Haul, and that person would then take off and "we'd all collect money from insurance."

There was no abuse of discretion in the admission of the evidence. Hearsay evidence going to a plan, common scheme, or course of conduct may be admissible, and its admission, and remoteness to the events at issue, is a matter committed to the judge's sound discretion. See, e.g., *Commonwealth* v. *Baldassini*, 357 Mass. 670, 677-678 (1970) (evidence of prior illegal betting acts of a defendant charged with gambling offenses probative of general scheme to violate gaming laws). We see no abuse of discretion in the present circumstances. We note that the judge exercised his discretion to exclude testimony concerning a discussion of an additional scheme which predated the June 3 collision by longer than the date of the conversations which were ruled admissible.

4. *Restriction on cross-examination of witness.* The defendants next contend that the judge improperly limited cross-examination of Katherine Stone, a Commonwealth witness, as to her purported bias against Robert. Stone testified that she lived downstairs in the same building as Robert and that she had a good relationship with him prior to June, 1993. In testimony which the judge ruled admissible only against Robert, Stone testified that Robert approached her on more than one occasion about plans to rent a U-Haul truck and told her that he had a "fast and easy way of making money." Stone testified that she rejected the suggestion. Robert's counsel elicited testimony from the witness on cross-examination that at the time of the discussions with Robert, she had a relationship with Stanley Wojcik, another uncle of Robert's, and through an offer of proof attempted to obtain Stone's testimony that Stanley had a history of child abuse, that Robert wanted her to terminate her relationship with Stanley, that she would lose her children if she continued with it, and that Stone was angry at Robert's interference in the relationship. The judge ruled that the testimony would not come in, on the basis that it was "two or three parties removed" and not "close enough to a showing that [Stone would] be lying for some reason here on the stand because of that."

"A defendant, of course, is entitled to a reasonable cross-

examination of witnesses against him, but, consistent with that principle, the scope of cross-examination rests in the sound discretion of the trial judge." *Commonwealth* v. *Weichel,* 403 Mass. 103, 105 (1988). We think the defendant has not shown an abuse of discretion. *Ibid.* The judge could well have concluded from Stone's testimony that her relationship with Stanley was not such that she would be angry at interference from Robert. The judge also could have concluded, as he did, that the defendant's "bias theory was too tenuous to be one that he was entitled to pursue on the record he presented." *Commonwealth* v. *Tam Bui,* 419 Mass. 392, 401, cert. denied, 516 U.S. 861 (1995). We observe that the defense successfully got on the record that other witnesses against Robert may have had grudges against him. There was no error or abuse of discretion.

5. *Admission of contents of two telephone calls.* Robert next complains that the judge improperly allowed testimony by Terrence Foley, who was a claims adjustor for the company that insured the U-Haul company,[10] as to the contents of two telephone calls Foley had with Robert, on the ground that there was an insufficient foundation laid for the admission of the contents of the calls. Robert's focus is not on the first call, which occurred on June 5, two days following the collision, but on the second from September 30, 1993. In an offer of proof the prosecutor conceded that Foley could not recognize the defendant's voice but argued that the identity of the caller should be a matter for the jury. Foley testified with respect to the June 5 call that the caller identified himself as Robert Wojcik and that he had not spoken with Robert before. The call came in about 10:45 A.M., and the caller complained that an investigator was supposed to have appeared at 10 A.M. and that he was upset that he had not arrived. Foley testified that during the September 30 call the caller indicated that he was calling about a letter sent to him from Foley's office, and that the caller indicated that he wanted to make a deal: although his attorney would settle for $10,000, he (the caller) would "wrap it up" that day for $6,000.

"A telephone conversation between a witness and a person the witness had never met may be admitted when confirming circumstances tend to authenticate the identity of the other person, even if . . . the witness does not recognize the voice."

---

[10]Foley testified that both Robert and Stephen filed claims for reimbursement for medical expenses.

*Commonwealth* v. *Anderson,* 404 Mass. 767, 770 (1989). See *Commonwealth* v. *Hartford,* 346 Mass. 482, 487-488 (1963). Here, the confirming circumstances of the identity of the caller were that, in the call of June 5, the caller referred to an appointment with an investigator (Foley had been assigned the claim on June 4) and that in the September 30 call the caller referred to a letter sent to him, as well as the amount of the claim. The jury could properly infer that the caller was Robert.

6. *Admission of Robert's statement to a social worker.* The defendants contend that the judge improperly permitted testimony from a licensed clinical social worker, as to conversations had with Robert on June 8, 1993, five days following the collision. The matter was the subject of a motion in limine filed by the defendant and there was considerable discussion at the bench prior to the commencement of trial and during the trial. The defendants argue that the conversations were privileged under G. L. c. 112, §§ 135A, 135B. The social worker testified over objection that Robert told him that he called the police and an ambulance after the collision and that he spent forty-five minutes comforting the victim, who "literally died before his eyes." In arguing for the admission of the testimony, the prosecutor made a showing that the statements were false and were made as a part of the attempt to defraud the insurance company.[11] In allowing the testimony, the judge observed that the statements in question amounted to "preliminary history" and did not go to diagnosis or treatment. General Laws c. 112, § 135B, as inserted by St. 1989, c. 535, § 1, protects conversations "relative to the diagnosis or treatment of the client's mental or emotional condition." Prior to 1989, the statute more broadly excepted communications that revealed "the contemplation or commission of a crime or a harmful act." See *Com-*

---

[11]Contrasting with Robert's alleged statements to the social worker, the Commonwealth elicited testimony from one Melissa Johnson, a certified nurse's aide, who happened upon the scene of the collision. Johnson heard a "screeching and crash" but did not observe the actual collision. She reached the scene within two or three minutes. Johnson observed two men (inferably Robert and Usher) peering into the Langevin vehicle and trying to open the driver's side door. The men then walked to a grassy area where one of the men (Robert) consoled the other. Johnson and another woman who identified herself as a nurse remained with Langevin until the arrival of an ambulance and the fire department. On this testimony, therefore, Robert's statements to the social worker that he remained in the Langevin vehicle for forty-five minutes comforting Langevin were demonstrably false.

*monwealth* v. *Merola*, 405 Mass. 529, 536 & n.5 (1989). No such exception appears in the present version of the statute.

At the outset of trial, it was made to appear that Robert had signed a release to allow the records in question to be communicated to his attorney, who forwarded them to the insurance company for payment of the claim. The Commonwealth then obtained the records pursuant to a grand jury subpoena. At oral argument in this court, appellate counsel for the Commonwealth indicated that the Commonwealth was not arguing for the admission of the records on any theory that Robert waived the privilege when he consented to their release to the insurance company, thereby causing the records to come into the public domain. This is because G. L. c. 112, § 135A, as inserted by St. 1989, c. 535, § 1, expressly provides that "[t]he provision of information acquired by a social worker from a client to any insurance company . . . shall not constitute a waiver or breach of any right to which said client is otherwise entitled under this section." Nor does the Commonwealth ask us to carve out an exception to the broad social worker-client privilege of the amended statute. The argument is, rather, that the particular facts in the present case show that the statements at issue were not made in connection with diagnosis and treatment but were false and were part of the continuing scheme to defraud the insurance company.[12]

The social worker-client privilege is qualified rather than absolute. See *Commonwealth* v. *Gauthier*, 32 Mass. App. Ct. 130, 135 (1992). "[W]hen the issue of privilege is raised, it falls to the judge to determine the nature and extent of the privilege." *Commonwealth* v. *Clancy*, 402 Mass. 664, 666 (1988). Notwithstanding the fact that the referral to the social worker was apparently made by a physician, the judge could have found that the statements in question were made not for the purpose of diagnosis and treatment but were part of the continuing scheme of insurance fraud. See and compare *Commonwealth* v. *Berrio*, 407 Mass. 37, 42-43 (1990) (nonprejudicial error). Admission of the statements did not interfere with the purpose of the privilege, which is to "prevent the chilling effect which routine disclosures may have had in preventing

---

[12]We observe that the judge ruled that testimony concerning a second visit by Robert to the social worker, in which the defendant complained of being "anxious, irritable, and preoccupied with the images of the deceased man," was privileged and not admissible.

those in need of help from seeking help." *Commonwealth* v. *Collett*, 387 Mass. 424, 428 (1982) (addressing a prior version of the statute). In the circumstances found here, a finding was justified that the admission of a limited portion of Robert's statements to the social worker promoted the proper administration of criminal justice. In reaching this result, we emphasize that we are not creating an exception to the statutory exclusion afforded privileged conversations. We are merely determining that in the particular circumstances of this case the privilege is not implicated because the statements were not made for the purpose of diagnosis or treatment, and their exclusion would not have advanced any purpose of the statute.

6. *Improper closing argument.* The defendants contend that the prosecutor's closing argument was improper in several respects. As there was no objection to the statements at trial, we review them only to determine whether they created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Richardson*, 423 Mass. 180, 188 (1996).

a. Shortly after commencing his summation, the prosecutor asked a rhetorical question:

> "How do you look inside the mind of Bob Wojcik and Steve Wojcik? Well, let's begin with the intent and the motive. *'The system is easy to beat.'* [Y]ou've heard the phrase, 'Never worked a day in his life.' Phrase doesn't apply to Bob Wojcik. You know exactly how many days he worked. He worked seven days as a machinist before he cut off the tip of his finger, and he worked thirty days at Red Lobster before he suffered an injury. 'The system is easy to beat.' What were his motives? Hanging in the air. 'We'll all be driving Caddies by the end of the summer.' "

The defendants argue that the clear implication of the remarks is that Robert's injuries were part of a fraudulent scheme to collect insurance benefits. While Robert testified on cross-examination that he had filed a worker's compensation claim in connection with his loss of the tip of his finger and that he worked at Red Lobster until he cut his finger, he never admitted that those actions were pursuant to a fraudulent scheme. While perhaps taking a few liberties with the implications of Robert's testimony, in the last analysis the prosecutor did not stray far from the evidence, and he is free to comment on matters in evidence. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987).

Usher's statement to the police on November 4, which he read to the jury, recites in part that Robert "mentioned other instances where he had made money by collecting insurance on injuries . . . . He said that I could back into something or let someone hit us, or hit a parked car. Steve reaffirmed this and said 'yeah, this system is easy to beat.' " There may have been a few embellishments but nothing to create a substantial risk of a miscarriage of justice.

b. Later on, the prosecutor commented, "So it wasn't their plan to go out and kill somebody. They wanted a little accident; and if that had happened, I submit to you, that not one of those six witnesses would have stepped forward and said anything. Small accident. It's just Bob. Just another scam." These comments were also based on the evidence. The jury could reasonably have inferred from the evidence that the defendants had been involved in other "scams."

c. Finally, the defendants point to the prosecutor's statements that "Somebody's lying. 'The system is easy to beat.' Today you're the system. Your verdict will describe how easy it is to beat the system. In our system of justice . . . the system works when people who are innocent are found innocent and when people who are guilty are found guilty." Even assuming that these remarks fall within the category of impermissible argument that exhorts jurors to do their duty and vindicate society by returning guilty verdicts, see, e.g., *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 573 (1991) (inappropriate for prosecutor to tell the jury that they were "the conscience of the community"), they do not approach the level of inflammatory prosecutorial argument found in cases relied upon by the defendant. See *Commonwealth* v. *Smith*, 387 Mass. 900, 910-911 (1983) (prosecutor's words, in effect, connoted that defendant "should not be let loose on society"); *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 (1989) (verdict of guilt would end victims' nightmares); *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 292-295 (1990) (where case against the defendant was fragile, prosecutor's rousing summons "sounded a persistent theme that the jury had a duty to confront crime in the streets bravely and to avenge the wrong done the victim"). In view of the strength of the Commonwealth's case, we think it unlikely that these comments affected the outcome of the trial, and, hence, they did not create a substantial risk of a miscarriage of justice. We also conclude that Robert's argument

that the remarks implied personal knowledge on the prosecutor's part is a strained construction of the remarks.

7. *Denial of motions for new trial.* The defendants filed motions for a new trial pursuant to Mass.R.Crim.P. 25(b)(2), second sentence, raising several points. The motions sought the exercise of the trial judge's discretion to reduce the verdicts and enter verdicts which were more "consonant with justice," more particularly, manslaughter. The trial judge's memorandum of decision denying the motions recites that "[i]t was for the jury to determine if a joint venture existed and if the actions of the defendants showed a high degree of likelihood that driving a truck forward in front of and into traffic to stage an accident would result in *substantial harm to another*" (emphasis supplied). The defendants point to the emphasized language to suggest that the trial judge was still unclear as to the difference between the mental state required for murder and manslaughter.

Rule 25(b)(2) "vests broad power in the trial judge. We defer to the trial judge because he has the advantage of face to face evaluation of the witnesses and the evidence at trial. He is in a far better position than we are to make the judgment required by the rule." Cf. *Commonwealth* v. *Cobb*, 399 Mass. 191, 192 (1987) (reduction of verdict from second degree murder to manslaughter was not an abuse of discretion). In the present case, we conclude that the gradation of the offense was properly left to the jury, and thus no abuse of discretion is shown.

It is true that in his memorandum of decision, the judge referred exclusively to the standard for involuntary manslaughter, substantial harm to another (the essence of wanton or reckless conduct); but, as we have pointed out (see note 5, *supra*), at trial the jury were correctly instructed, initially and in a supplementary instruction after a question from the deliberating jury, as to the standards for second degree murder with malice and for involuntary manslaughter. In between the two instructions, the judge briefly referred, incorrectly, to the "grievous bodily harm" language which has been written out of the instruction for third prong malice. The last words the jury heard were from the correct supplementary instruction. See *Commonwealth* v. *Jefferson*, 416 Mass. 258, 265 (1993). In the circumstances, the judge correctly concluded that the grade of offense was a matter for the jury, and there was no error in the denial of the rule 25(b)(2) motion. "Whether or not we would have reached the same decision, we conclude that there was no

abuse of discretion." *Commonwealth* v. *Greaves*, 27 Mass. App. Ct. 590, 595 (1989).

*Judgments affirmed.*

*Order denying motions for new trial affirmed.*