ADOPTION OF SAUL.[1]

No. 03-P-269.

Suffolk. September 10, 2003. - March 3, 2004.

Present: LENK, SMITH, & DUFFLY, JJ.

*Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Minor,* Adoption, Visitation rights. *Evidence,* Privileged communication, Communication between patient and psychotherapist, Medical record. *Privileged Communication.*

In an action to dispense with the biological parents' consent to the adoption of their child, the judge did not err in admitting in evidence the mother's psychiatric records containing references to diagnoses of her mental illness, where the records were not subject to the psychotherapist-patient privilege under G. L. c. 233, § 20B, in that the challenged notations did not reveal the mother's privileged communications [549-554]; moreover, this court found no basis for the mother's other claims of privilege, which were made without citation to the record identifying the communications or the basis for the claim of privilege [554-555].

In an action to dispense with the biological parents' consent to the adoption of their child, the judge did not abuse his discretion in deciding not to order postadoption visitation by the father, where there was sufficient evidence to support the judge's findings of a lack of any significant bond between the father and child and of the adoptive mother's opposition to visits by the father. [555-557]

PETITION filed in the Boston Division of the Juvenile Court Department on August 2, 2000.

The case was heard by *Stephen M. Limon,* J.

*Henry C. Porter* for the mother.

*R. Scott Miller, Jr.,* for the father.

*Sheila L. York,* Assistant Attorney General, for Department of Social Services.

*Robert D. Dimler* for the child.

[1] A pseudonym.

DUFFLY, J. In this appeal by the biological parents from a decree dispensing with their consent to the adoption of their child, the mother claims that psychiatric records admitted in evidence containing references to diagnoses of her mental illness are subject to the psychotherapist-patient privilege under G. L. c. 233, § 20B. The father appeals solely from the denial of his request for postadoption visitation. We affirm the decree.

1. *Background facts and proceedings.* We summarize the findings of fact relating to the mother's ability to parent.[2]

At the time of Saul's birth, on July 26, 2000, the mother was a psychiatric patient at the Solomon Carter Fuller Mental Health Center (Solomon Carter). A report, pursuant to G. L. c. 51A, was filed by a mandated reporter at the time of Saul's birth citing concerns about the mother's mental health, and the Department of Social Services (department) petitioned for and received temporary custody of the child. Saul was born prematurely and, due to his low birth weight, remained in the Boston Medical Center's neonatal care unit for three weeks until he was released to foster care.

The mother's history of psychiatric hospitalizations began in 1992, with a four-month hospitalization in Bellevue Hospital in New York City. A month-long psychiatric hospitalization at Cambridge Hospital in 1995 was followed by commitment, in early September, 1997, to Worcester State Hospital for an evaluation of her competency to stand trial in connection with her alleged violation of a restraining order. She was found incompetent to stand trial and was committed to Solomon Carter. Her admitting diagnosis was that she was suffering from a psychotic disorder, with symptoms that included delusions, paranoia, tangential and disorganized thinking, and grandiosity. Initially, she refused to take the psychiatric medication that she had been taking. A judge found her incompetent to make treatment deci-

[2]The father does not challenge the judge's finding of unfitness as to him. The father and the mother were not married and did not live together; he has never lived with the child. At the time of trial, the father was a resident of Conley House, a Department of Mental Health group home. The father suffers from bipolar and schizoaffective disorder for which he takes medications and attends counseling. He concedes that his illness — which causes him to suffer chronic and distracting hallucinations, resulting in his withdrawal from others — prevents him from being available to care for Saul.

sions and ordered treatment with an oral antipsychotic medication. Upon the mother's continued refusal to take that medication, the judge ordered injections of the drug Haldol. After the mother's discharge from Solomon Carter in April, 1998, she was placed in the Virginia Street Home, a Department of Mental Health (DMH) sponsored group home in the Dorchester section of Boston. (Children are not permitted to reside at the Virginia Street Home.) When the order mandating treatment expired in June, 1998, the mother again stopped the medication.

After her first prenatal visit in February, 2000, while pregnant with Saul, she was admitted to the Boston Medical Center for treatment of diabetes. The following month, having twice left the Boston Medical Center, and because she was noncompliant with dietary restrictions, the mother was transferred to the psychiatric unit at Beth Israel Deaconess Health Center (Beth Israel). In May, 2000, when the mother's mental and physical health was stabilized following court-ordered treatment with Haldol injections and insulin, she was again transferred to Solomon Carter. Upon her discharge from Beth Israel, the mother was adamant that she did not want to take her prescribed antipsychotic medication. She remained at Solomon Carter until giving birth to Saul at the Boston Medical Center. The mother eventually resumed living at the Virginia Street Home. While there, the mother persisted in her refusal to take the medications for schizophrenia that had been prescribed for her, or to meet with healthcare professionals.

During the approximately seventeen-month period following Saul's placement in foster care, the mother had supervised visits with Saul for one hour every other week. Although offered weekly visits, the mother elected to visit Saul less often, and at times, she was late for those scheduled visits. The department made efforts to provide the mother with training in proper childcare, but she did not complete her parenting classes, and social workers supervising the visits were repeatedly called upon to prompt the mother with respect to ordinary child-caring tasks.[3] The mother did not interact with the child during visits, and

[3]The mother required prompting as to how to hold the infant safely, diaper him properly, wipe his face, and comfort him when he was in distress. The social worker also had to remind the mother what foods were appropriate for

both the mother and the father were reluctant to hold Saul (often holding him at the end of outstretched arms).

The mother had difficulty listening to, fully understanding, and responding directly to questions of ordinary complexity. The judge found that this difficulty would hinder the mother's ability to engage in the types of communications necessary for adequate child-rearing and interacting with school and medical providers on the child's behalf. The judge also found that when her mental illness is untreated, as it frequently was, her condition is exacerbated and she relapses into psychosis, preventing her from living independently.

2. *Discussion.* a. *Psychotherapist-patient privilege.* The mother made timely objections to the admission of her psychiatric records on privilege grounds.[4] We review to determine if there was error and, if so, whether the error substantially prejudiced the mother. See G. L. c. 231, §§ 119, 132 (error in admission of evidence should not be ground for modifying or disturbing judgment or for granting new trial unless error has "injuriously affected the substantial rights of the parties"); *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 274-275 (1990); *Adoption of Sherry*, 435 Mass. 331, 336 (2001).

The mother's primary argument on appeal focuses on unredacted notations in her psychiatric records setting forth the diagnoses of "schizophrenia" or "schizoaffective disorder." We

---

an infant. During one visit, the mother brought a baby bottle containing black coffee and was told that babies do not drink black coffee because the caffeine is not good for them. Protesting that it was good for Saul, the mother persisted in attempting to feed Saul coffee. She expressed her belief that the infant Saul was stubborn for refusing to eat food (pickles and cheese balls, for example) she had brought. On one occasion the mother, by placing him unattended on a table, failed to keep him safe; he was caught as he was rolling off. On another, the mother failed to notice that he was putting a large piece of a cookie into his mouth.

[4]We do not address the mother's claim — contained in her trial court memorandum in opposition to the department's request to admit her psychiatric records in evidence, to which she makes passing reference in her brief — that disclosure of her records was a violation of a constitutional or statutory right of privacy. "This method of briefing does not conform fully to the requirements of the appellate rules. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 919 (1975)." *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 351 n.17 (1983) (declining to consider claims of defendant raised in memorandum of law presented to single justice and reprinted in defendant's appendix).

reject the mother's contention that, because any diagnosis as to the nature of her mental illness could not have been made absent communications to her psychotherapist in the course of treatment or diagnosis, the notations reflecting the diagnoses of "schizophrenia" or "schizoaffective disorder" are privileged communications under G. L. c. 233, § 20B.[5]

The statutorily defined psychotherapist-patient privilege concerns patient communications made to a psychotherapist. It extends to a patient the right to refuse to disclose, or prevent a witness from disclosing, communications between the patient and her psychotherapist that were made "relative to" (that is, "for the purpose of diagnosis or treatment," *Commonwealth* v. *Wojcik*, 43 Mass. App. Ct. 595, 609 [1997]) the diagnosis or treatment of the patient's mental or emotional condition. G. L. c. 233, § 20B, as inserted by St. 1968, c. 418. The statute defines "[p]atient" as "a person who, during the course of diagnosis or treatment, communicates with a psychotherapist," and defines communications as "conversations, correspondence, actions and occurrences relating to diagnosis or treatment before, during or after institutionalization, regardless of the patient's awareness of such conversations, correspondence, actions and occurrences, and any records, memoranda or notes of the foregoing." *Ibid.*[6] The focus of the statute is patient communications. The legislative enactment recognizes that a productive psychotherapist-patient relationship is dependent

---

[5]On appeal, the mother does not argue that her communications with social workers were privileged under G. L. c. 112, § 135B. The trial judge did, however, include communications with social workers in his review of the documents at issue.

[6]We do not interpret the phrase "relating to diagnosis or treatment before, during or after institutionalization" as limiting the privilege to communications made by a patient who has been or may be institutionalized. When read in conjunction with other provisions in the statute to "yield[] a more effectual and harmonious piece of legislation," *Commonwealth* v. *Lamb*, 365 Mass. 265, 269 (1974), it is clear that the privilege attaches to all "communication[s] . . . between [the] patient and [her] psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition," subject only to exceptions specified in the statute. G. L. c. 233, § 20B. As mentioned above, the statute defines "patient" as "a person, who during the course of diagnosis or treatment, communicates with a psychotherapist"; and it describes the privilege as applicable to "patients engaged with a psychotherapist in marital therapy, family therapy, or consultation in contemplation of such

upon the confidentiality of communications made by a patient in the course of treatment or diagnosis. *Usen* v. *Usen*, 359 Mass. 453, 457 (1971). See *Bieluch* v. *Bieluch*, 190 Conn. 813, 819 (1983) (discussing Connecticut privilege statute, which was template for G. L. c. 233, § 20B, see note 6, *supra*, and stating, "The statute provides a privilege for confidential communications so that a patient may safely disclose to his therapist personal information that is necessary for effective treatment or diagnosis").

General Laws c. 233, § 20B, thus protects from compelled disclosure conversations and other communicative conduct ("correspondence, actions and occurrences") which relate to diagnosis or treatment, but not the diagnosis itself. See *Commonwealth* v. *Lamb*, 365 Mass. 265 (1974) (G. L. c. 233, § 20B "applies to communications"); *Commonwealth* v. *Mandeville*, 386 Mass. 393, 408 (1982) (G. L. c. 233, § 20B "grants to a 'patient' the privilege of preventing a witness from disclosing any communications made between himself and his 'psychotherapist' "); *Petitions of the Dept. of Social Servs. to Dispense*

therapy." *Ibid.* None of these circumstances necessarily involve institutionalization.

We think that the phrase "relating to diagnosis or treatment before, during or after institutionalization," must be read with reference to exception to the privilege applicable when a treating psychotherapist determines that the patient requires hospitalization for mental illness. G. L. c. 233, § 20B(*a*). In that connection, it is clear that, although disclosure of otherwise privileged communications is permitted "for the purpose of placing or retaining the patient in such hospital," the privilege remains in force after the patient is hospitalized. *Ibid.*

Thus, except as to communications that are directly relevant to the commitment proceeding, the privilege continues to attach to all other communications, whether made "before, during or after institutionalization." *Ibid.* See *Usen* v. *Usen*, 359 Mass. 453, 457 (1971), noting that G. L. c. 233, § 20B, "seems to have been modeled on a statute enacted in Connecticut in 1961," citing, among other authorities, Goldstein and Katz, Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute, 36 Conn. Bar. J. 175 (1962). Goldstein and Katz recognize the importance of laying down guidelines that specify "when the privilege begins and when it ends." *Id.* at 183. "[I]t is important to note that the privilege is to be terminated only for the purpose of securing hospitalization or instituting commitment proceedings. It remains in force after the patient is hospitalized" as long as the patient's communication relates to diagnosis or treatment. *Id.* at 186-187. "Only those communications may be disclosed which are relevant to the commitment proceeding in which [the psychotherapist] is asked to testify." *Id.* at 187.

*with Consent to Adoption*, 399 Mass. 279, 287 (1987) ("records are privileged if they contain the communications or notes of communications between the patient and a psychotherapist"). Cf. *Commonwealth* v. *Kobrin*, 395 Mass. 284, 294 (1985) (holding, in context of grand jury investigation into Medicaid fraud, that patient diagnosis is not privileged but portions of records that "reflect patients' thoughts, feelings, and impressions, or contain the substance of the psychotherapeutic dialogue are protected"); *Adoption of Seth*, 29 Mass. App. Ct. 343, 353 (1990); *Sorenson* v. *H & R Block, Inc.*, 197 F.R.D. 199, 205 (D. Mass. 2000) (interpreting scope of G. L. c. 233, § 20B, and concluding that privilege was not waived by patient disclosure of identity of psychotherapist or dates and costs of treatment, or by revealing general description of substance of communications).

Where, however, a psychotherapist testified to more than a simple diagnosis, including predictions of future behavior, based upon and conveying confidential communications, those statements have been cloaked with the privilege. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 520, 526 (1986).[7] See also *Commonwealth* v. *Clancy*, 402 Mass. 664, 667-668 (1988) (because patient-witness had first testified to his diagnosis and had, therefore, waived any privilege, defense counsel was permitted to question patient about this diagnosis; there was no specific discussion as to whether, in absence of waiver, privilege would have attached).[8]

The challenged notations, indicating that the mother was

---

[7]In *Department of Youth Services* v. *A Juvenile*, *supra* at 520, the psychotherapist testified to having conducted a psychiatric evaluation of the juvenile and gave the following assessment: "[T]he juvenile had 'disorders of emotion and perception' which manifested themselves by an 'inability to cope with the demands of life,' inappropriate anger, stealing, lying, self-doubt, and aggression toward others. . . . '[T]here's a great likelihood that those type of behaviors [i.e., 'inappropriate contact of a sexual nature in young children'] will be repeated again [unless the juvenile undergoes] a substantial change in his personality structure.' . . . [T]he juvenile presented a "very significant danger [to] the physical well being of the community.' " Referring to this assessment as a "diagnosis," the court held that it was error to admit the psychotherapist's opinion in evidence because the juvenile's communications were implicit in the diagnosis. *Id.* at 526.

[8]Because of the waiver, we do not view as controlling the intimation in *Clancy*, *supra* at 667, that, when the purpose of a hospitalization requires

diagnosed as suffering from "schizophrenia" and "schizoaffective disorder," do not reveal the mother's privileged communications to a psychotherapist. The statute protects a patient's communications made to her psychotherapist "relating to diagnosis or treatment." There is nothing in a plain reading of G. L. c. 233, § 20B, that permits the interpretation that diagnostic terms, without more, are also privileged. The mother's proposed interpretation of the statute may be achieved only by ignoring the language of § 20B and adding the additional language "as well any diagnosis made based on such communication."[9] This would change the statute's plain meaning and, in effect, inappropriately amend it. See *Hayes* v. *Retirement Bd. of Newton*, 425 Mass. 468, 471 (1997).

In those instances where, as here, the diagnostic term does not reveal or convey the content of privileged communications, it is not protected from evidentiary disclosure by the privilege. The notations are therefore not privileged, and the admission in evidence of references to the mother's diagnoses of "schizophrenia" and "schizoaffective disorder" was not error.[10]

We agree with the notion, implicit in the mother's argument, that a finding of unfitness cannot be based solely on the conclu-

disclosure of a diagnosis, "the purpose is within the privilege" and therefore not admissible. Reference to specific diagnostic terms cataloged in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) would, in most instances, not fall under the privilege. See *Lambley* v. *Kameny*, 43 Mass. App. Ct. 277, 278 n.4 (1997) (recognizing DSM as "standard authority" for diagnostic criteria of mental disorders).

There may, of course, be instances when reference to a DSM diagnostic category may so implicate a patient's confidential communication that the diagnosis ought to be privileged. See, for example, DSM at 567-572 (4th ed. rev. 2000), in which the diagnostic category "Sexual Dysfunction Not Otherwise Specified" includes "exhibitionism," "fetishism," and "pedophilia"; and the diagnostic category "Impulse Control Disorders Not Elsewhere Classified" includes "kleptomania" and "pathological gambling," *id.* at 667, 671. We leave to a case-by-case determination whether such references are so revealing of patient communications as to involve the privilege.

[9]For an example of a statute that provides for the confidentiality of "the identity, diagnosis, prognosis, and treatment of any patient" in certain substance abuse programs, see 42 U.S.C. § 290dd-2(a) (2000).

[10]Moreover, because we have determined that such notations, when made by a psychotherapist or social worker, are not privileged communications, it also was not error to admit such references when repeated by a nurse or other hospital personnel.

sion that the mother suffers from a mental illness. "Mental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." *Adoption of Frederick*, 405 Mass. 1, 9 (1989). Cf. *Adoption of Katharine*, 42 Mass. App. Ct. 25, 34 (1997). Here, there was a connection between the mother's inability to parent and her mental illness; there was also ample evidence, apart from the diagnoses of mental illness, that the mother was unfit to parent Saul.[11]

The mother makes other claims of privilege, without citation to the record identifying the communications or the basis for the claims of privilege. We exercise our discretion in disposing of those claims without in-depth discussion. See *Lynn* v. *Thompson*, 435 Mass. 54, 56 n.4 (2001).

Statements made by the mother as reflected in the psychiatric records, denying that she suffers from mental illness or requires medication, are also contained in documentary evidence and trial testimony admitted without objection. Thus, even if privileged, the statements were cumulative and did not prejudice the mother. See *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 672 (1989); *Adoption of Sean*, 36 Mass. App. Ct. 261, 264 (1994).

For the reason that they do not "relat[e] to diagnosis or treatment," we also conclude that certain communications made by the mother to her social workers or psychotherapists were not

---

[11]Evidence of the diagnoses of schizophrenia and schizoaffective disorder was relevant to the question whether there was any likelihood that in the near future the mother would, with appropriate treatment for her condition, become fit. The evidence that the mother had been diagnosed by multiple psychotherapists as having a mental illness requiring treatment with antipsychotic medication and talk therapy, coupled with the mother's persistent denials that she suffers from mental illness and her failure to partake of the prescribed treatments, supports the finding that the mother's untreated mental illness will continue to render her unavailable to provide appropriate parenting to her child.

Thus, a parent's psychiatric history reflecting diagnoses of mental illness, treatment protocols for the illness, and whether the parent has been consistent in following the prescribed treatment, while not alone determinative of unfitness, may become significant once a nexus has been established between the illness and diminished parenting ability. We do not think that the Legislature, in enacting G. L. c. 233, § 20B, intended that access to this vital information would be precluded.

privileged (such as, for example, her statement, "I'm not hungry. I don't want to eat"). Compare *Commonwealth* v. *Wojcik*, 43 Mass. App. Ct. at 609.

The records reflect some communications by the mother that could relate to diagnosis or treatment if made to a psychotherapist (or social worker). It is the patient who must assert the privilege. *Commonwealth* v. *Oliveira*, 438 Mass. 325, 331-332 (2002), and cases cited. This requires that the patient provide the information necessary to determine whether the person to whom the communication was made qualifies as a psychotherapist under the statute. See *id.* at 334. Without this information, the judge would have to "resort to 'inferences' concerning the actual status of the professionals whose signatures and initials appeared in the records" and the contents of the entries to determine if they were made by a "psychotherapist" under G. L. c. 233, § 20B, or a "social worker" under G. L. c. 112, § 135B. *Id.* at 333. The mother having failed to provide the necessary information to the trial judge, the judge was well within his discretion to deny the mother's request that such notations be redacted.

The mother's communications to Dr. Nuzhat Farooqui were in connection with Solomon Carter's petition, pursuant to G. L. c. 123, § 8B, for authorization to provide the mother with medical treatment for her mental illness. Dr. Farooqui provided the mother with notice that her conversations with him would not be confidential, and the mother indicated to him that she understood. See *Commonwealth* v. *Lamb*, 365 Mass. at 269.

Even if there had been error in the admission of any of the above-discussed communications, there was ample evidence, apart from the challenged communications, to support the finding of unfitness. See *Adoption of Christine*, 405 Mass. 602, 608 (1989).

b. *Postadoption visitation.* The father contests the judge's decision not to order postadoption visitation, contending that there was no evidence to support the judge's findings (1) of a lack of any significant bond between the father and child and (2) of the adoptive mother's opposition to visits by the father. Appellate review of a judge's denial of a request for postadoption visitation is under the abuse of discretion standard. *Adop-*

*tion of Nicole*, 40 Mass. App. Ct. 259, 264 (1996). There was no abuse of that discretion here.[12] The evidence was sufficient "to support the judge's findings on these issues, and the judge was free to consider and reject contradictory evidence." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 397 Mass. 659, 672 (1986).[13]

A judge may decline to order postadoption visitation, or "may order limited postadoption contact, including visitation, between a child and a biological parent where such contact is currently in the best interests of the child." *Adoption of Vito*, 431 Mass. 550, 553 (2000). "[A]n order for postadoption contact is grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation." *Id.* at 562.

Here, the father's sole interaction with Saul occurred during brief visits, over a limited time frame, that at times were weeks apart. The child has never lived with the father, who concedes his unfitness as a parent. During the nearly eighteen months that visits were provided, the father opted for fewer visits than the weekly visits offered by the department and missed scheduled visits. At times he was as much as twenty minutes late for the hour-long visit, and at least once, he stayed only ten minutes. This was evidence sufficient to support the judge's conclusion that postadoption visitation was not warranted.

The father argues that the judge's findings that there was no significant or meaningful bond between the father and the child and that visits were not in the child's best interests were errone-

---

[12]We also reject the father's claim, raised for the first time on appeal, that it was error for the judge to decide the visitation issue without first holding an evidentiary hearing following the trial to determine if postadoption visits were warranted. See *Adoption of Pierce*, 58 Mass. App. Ct. 342, 348 (2003) (decision to hold evidentiary hearing on issue of visitation is discretionary).

[13]Even if, as the father claims, the finding that the adoptive mother was opposed to postadoption visits is erroneous, we would not disturb the judge's ruling, as other evidence amply supports the decision that court-ordered visits were not in the child's best interests.

ous because they were not based on expert testimony.[14] Here, however, the judge's determination as to visitation was not dependent upon evidence of psychological bonding and the harmful effects to the child of disruption of that bond. See *Adoption of Gregory*, 434 Mass. 117, 129 (2001). Rather, the determination was based on evidence of the nature and effect on parenting of the father's mental illness; on the fact that the child has never lived with the father; and on the fact that the father limited his visitation with the child. The evidence to which the father points — of his attentiveness at visits and his affection for his son — does not negate the judge's findings or require expert testimony.[15]

There was no error in the judge's denial of the father's request for postadoption visitation.

*Decree affirmed.*

---

[14]The parents declined to participate in an evaluation by the court-appointed expert, Dr. Richard Barnum. Dr. Barnum's report indicates that he was asked by the department to observe the parents in their visits with Saul, but as they refused to be evaluated, no such observations were made.

[15]It may well be that, in circumstances not present here, a trial judge would benefit from expert testimony to facilitate her understanding of "bonding and other circumstances of the actual personal relationship of the child and the biological parent." *Adoption of Vito*, 431 Mass. at 562. Compare *In re J.C.*, 129 N.J. 1 (1992) (discussing need for expert testimony to aid in complex assessment of bonding in context of termination proceeding).